UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ARCH SPECIALTY INSURANCE
COMPANY,

        Plaintiff,

v.                                                      Case No: 6:18-cv-1149-WWB-DCI

BP INVESTMENT PARTNERS, LLC,

        Defendant.
_____/

## ORDER

THIS CAUSE is before the Court on Defendant BP Investment Partners, LLC's ("**Defendant**" or "**BPI**") Ore Tenus Motion for Mistrial (Doc. 280), Ore Tenus Motion for Sanctions (Doc. 281), Motion for New Trial (Doc. 304), Renewed Motion for Judgment as a Matter of Law (Doc. 305), and Plaintiff's Responses (Doc. Nos. 295, 296, 325, 332).

Defendant moves for a new trial pursuant to Federal Rule of Civil Procedure 59 based upon the improper statements made by Plaintiff's witness Samuel Glicken and based upon the improper admission of the Examination Under Oath testimony of Micah Bass as substantive evidence. Defendant further asks that the verdict be set aside and the parties be directed to an appraisal to determine the amount of Defendant's insurance claim. For the reasons set forth below, Defendant's motions will be denied.

I.     **BACKGROUND**

The M Hotel at the center of this dispute was built in 1972 and originally operated as a Howard Johnson. (Doc. 164, ¶ 5). Micah D. Bass formed Defendant to acquire and operate a hotel at 6603 International Drive, Orlando, Florida 32819, and Defendant

bought the M Hotel.  (*Id.* ¶¶ 2–3, 5).  Plaintiff Arch Specialty Insurance Company ("**Plaintiff**" or "**Arch**") issued Defendant a commercial property insurance policy, Policy No. ESP 7303245-01 (Doc. 1-2) for the property.  Hurricane Irma made landfall in Orlando on September 10 and 11, 2017, as a Category 1 hurricane with sustained winds of fifty to sixty miles per hour.  (Doc. 101-3, ¶ 8; Doc. 163, ¶ 4).  Defendant subsequently filed a claim with Arch for nearly $8,000,000.00 in financial damages to the M Hotel arising from Hurricane Irma, including $803,775.40 that Defendant claims it spent on temporary repairs.  (Doc. 101-3, ¶ 8; Doc. 149-6, ¶ 6; Doc. 163, ¶ 30; Doc. 163-25).

On July 17, 2018, Arch filed a Complaint (Doc. 1) against Defendant, alleging that it submitted "a false and fraudulent insurance claim" for damages allegedly resulting from Hurricane Irma that instead arose from "(a) the intentional and fraudulent acts and omissions of Defendant[] and others acting at [its] direction; (b) the prior and long-running neglect and mismanagement of the insured property, and (c) the ordinary wear and tear of the premises[.]"  (*Id.* ¶ 1).  Arch further alleged that Defendant engaged "in an extensive and well-planned presentation to Arch of . . . claims that were intended to defraud Arch out of roughly $8 million of insurance proceeds."  (*Id.* ¶ 2).  After extensive pre-trial motions practice, a single count for declaratory judgment seeking a declaration that the Policy is void for fraud proceeded to trial.  (Doc. 60; Doc. 244 at 9).

To support its allegations at trial, Plaintiff presented Samuel Glicken, a licensed public adjuster hired by Defendant.  (Doc. 283 at 3:19, 4:12–21, 7:21–23).  Glicken agreed that a public adjuster acts as an advocate for the insured and that his license could be revoked for participating in a fraudulent insurance claim.  (*Id.* at 4:2–3, 5:12–14).  After observing the condition of the M Hotel, Glicken explained that the damage to the hotel

looked "weird"—he had never seen a hotel remediated in that way. (*Id.* at 13:3–19). He further explained that it did not make sense that the list of damages provided to him could have resulted from the hurricane. (*Id.* at 13:20–14:5).

Glicken ultimately resigned as Defendant's public adjuster because he did not agree with its claim and was concerned that it might be fraudulent. (*Id.* at 14:11–12, 15:8–19; 17:1–2). He denied that he was fired by Bass. (*Id.* at 20:10–12). When asked on cross-examination if it would surprise him that Bass had a different recollection, Glicken responded "I wouldn't be surprised by anything he has to say." (*Id.* at 20:13–15). On redirect, Plaintiff asked Glicken to explain this comment. On the first attempt, Defendant's hearsay objection was sustained because Glicken began to relate something he discussed with a friend. (*Id.* at 22:21–23:6). Glicken indicated he did not know how to proceed without that information. (*Id.* at 23:7–8). On Plaintiff's second attempt, Defendant's hearsay objection was sustained after Glicken began to testify about something he was shown. (*Id.* at 23:10–17). Plaintiff rephrased its question to "did you come to formulate any personal opinions about Mr. Bass?" (*Id.* at 23:19–20). Before Glicken could answer, the Court sustained Defendant's relevance objection. (*Id.* at 23:22–24:1). Finally, Plaintiff asked "Sir, without invoking this hearsay issue, are you able to explain to the court why you wouldn't be surprised by anything Mr. Bass has to say." (*Id.* at 24:3–5). There was no objection and Glicken answered, "Apparently there was past fraudulent activity that can be looked at on Google." (*Id.* at 24:6–7). Defendant objected once the answer was out and moved for a mistrial in the presence of the jury. (*Id.* at 24:8, 10). The Court struck Glicken's statement, instructed the jury to disregard it, and asked the jury to step into the jury room. (*Id.* at 24:11–15).

3

Defendant argued that a mistrial was warranted because no curative instruction could cure Glicken's testimony. (*Id.* at 25:4–18, 21–25). The Court took the motion for mistrial under advisement but noted it was improper for Plaintiff to continue to ask the question after the Court had sustained three objections. (*Id.* at 27:10–12, 28:20–23). The Court offered Defendant the opportunity to draft a curative instruction. (Doc. 317 at 5:7–12). Defendant proposed that the only possible cure was to strike all of Glicken's testimony based on the improprieties in his testimony. (Doc. 312 at 13:2–12; Doc. 335 at 109:23–110:3, 110:6–19). The Court declined to do so and recommended a generic instruction to avoid drawing attention to the stricken statement. (Doc. 312 at 13:13: Doc. 335 at 112:20–113:19). Accordingly, prior to deliberations the jury was instructed: "During the course of the trial, I sustained objections and disallowed certain testimony by 'striking' it and ordered you to disregard or ignore it. That means you must not consider that testimony or other evidence when you are deciding the case." (Doc. 289 at 3; Doc.335 at 203:9–13). Notably, Plaintiff avoided compounding any perceivable error by not mentioning Glicken in its closing argument. Defendant, however, argued in closing that Glicken had an ax to grind because Bass had fired him. (Doc. 335 at 178:1–3).

During the trial, Plaintiff also sought to admit, over objection, the transcripts of the sworn testimony Bass gave at two Examinations Under Oath ("**EUO**"). (Doc. 291 at 1–10). At trial, Defendant argued the EUOs were inadmissible because Bass did not have counsel and there was no cross-examination; thus, the EUOs were not comparable to a deposition. (Doc. 298 at 3:19–4:2). Although Defendant was put on notice as early as November 17, 2020, that Plaintiff intended to utilize the EUOs during trial, it contended that it was prejudiced because Plaintiff had not specifically designated which pages of the

eight hundred pages Plaintiff intended to highlight. (Doc. 258-1 at 1–10; Doc. 298 at 7:7–22). Defendant also argued that it would not be fair to put the entire EUOs into evidence and allow the jurors to "rummage through it and look at whatever they wanted." (Doc. 298 at 9:15–18). Plaintiff advised the Court that it was not planning to read the entire EUOs into the record, but it intended to ask about the destruction of exhibits. (*Id.* at 9:1–6). The Court instructed Plaintiff to make a proffer at the time it was going to admit the EUOs. (*Id.* at 9:19–10:2). The Court ultimately admitted the transcripts as an admission by a party opponent. (Doc. 315 at 157:3–7).

The EUO transcripts were offered into evidence through Jeffrey Nonhof, the executive general adjuster who attended the EUOs on behalf of Plaintiff. (Doc. 315 at 90:9–16, 93:1–3, 134:15–16). Nonhof highlighted several misrepresentations he believed Bass made during the EUOs, including Bass's omissions concerning Alex Juras, prior leaks in the roof, windows, and PTAC units, and renovations to the pool. (*Id.* at 137:22–139:21). Nevertheless, Defendant continued to argue that it could not meaningfully cross-examine the witnesses without knowing with specificity which admissions from the EUOS Plaintiff intended to use. (*Id.* at 159:5–8). The Court highlighted that Nonhof had just testified to which statements in the EUO he believed were false: that Bass told him that there were no prior roof leaks, no prior leaking windows, no prior leaks with the PTAC units, and there was no scheduled renovation to the pool. (*Id.* at 159:14–19). The Court advised Defendant that if it needed to recall a witness concerning statements in the EUO brought out during the trial the Court would allow it. (*Id.* at 161:15–18).

The evidence against Defendant was overwhelming. For example, Defendant submitted moisture mapping for the M Hotel that was almost identical to another hotel owned by Bass. (Doc. 317 at 42:16–24, 43:6–16, 49:10–11). The readings for rooms 214 through 221 of the M Hotel were identical to the readings for rooms 214 through 221 of Bass's second hotel. (*Id.* at 50:23–51:3). In addition, there were readings for rooms ending in the number thirteen even though those rooms do not exist. (*Id.* at 74:17–22). Without objection, a witness testified twice that he compared the moisture mapping reports for both of Bass's hotels "at the last court." (*Id.* at 48:22–24, 49:7–9). When asked if there was an explanation for why both reports are so similar, the witness answered, "Since the last court case. . . I've asked several other people in the industry, and they said it's unlikely, but it's not improbable . . . because of the close proximity of the buildings and the similar building materials." (*Id.* at 49:12–17).

There was expert testimony that Hurricane Irma had minimal impact on the M hotel and the damage that did occur was cosmetic—not to the buildings themselves. (Doc. 286 at 10:6–9). A forensic meteorologist testified that the sustained winds at the M Hotel were below hurricane force—the maximum sustained surface gusts at the hotel were estimated between 75 and 85 miles-per-hour. (Doc. 315 at 60:11–15, 75:6–9). There were no reports of tornados near the hotel, and the radar did not show any tornadoes. (*Id.* at 61:12–13). The forensic meteorologist testified that there was approximately 7.66 inches of rain over a period of four days. (*Id.* at 61:18–19).

Plaintiff's investigation of the damages estimated that the damages to the M Hotel totaled $298,383.70. (Doc. 315 at 48:4–9). Plaintiff believed their investigation was impeded because the guest rooms of the M Hotel had been altered before the damage

6

could be confirmed. (*Id.* at 49:21–50:8, 111:17–112:4). Further, Plaintiff observed that the M Hotel was poorly maintained. (*Id.* at 95:15–18). For example, the roof was in terrible condition, the stairwells were rusted, and the doors were old. (*Id.* at 95:21–22). The landscape, however, seemed to be undisturbed when Plaintiff arrived at the property after the hurricane. (*Id.* at 99:12–18).

Moreover, Plaintiff received less than fifty percent of the records requested from Bass. (*Id.* at 113:3–19). During the EUO, Bass ripped up the proofs of loss he provided as exhibits and put them in his backpack. (*Id.* at 135:12–136:7). Plaintiff did not receive any photographs reflecting the condition of the guestrooms before they were altered or of the roof immediately after the hurricane and before repairs were made. (*Id*. at 113:24–114:12). Plaintiff also did not receive information related to the moisture mapping activities they requested. (*Id.* at 114:19–115:5). As part of the estimate, Defendant submitted a bill that they were paying $260,409.60 for two security guards for twenty-four-hour coverage for 120 days. (*Id.* at 127:19–128:1). Yet, at times only one security guard was observed during business hours. (*Id.* at 128:2–10).

There was additional evidence that Bass was deceptive as to his relationship with Juras, Bass's cousin and former employee, who prepared the estimates for the insurance claim. (Doc. 317 at 53:7–16, 22–24). Bass stated that he first met Juras when Juras appeared on behalf of World One as their estimator. (Doc. 315 at 137:22–138:2). It was later discovered that Juras was Bass's twenty-year-old cousin who was living with him. (*Id.* at 138:10–16). Bass stated at the EUO that the roof, windows, and the PTAC units of the M Hotel were not leaking prior to the hurricane. (*Id.* at 139:2–13). However, state inspections suggested otherwise. (*Id.* at 141:1–9, 142:3–4, 143:21–22). In addition,

despite denying prior plans to renovate the pool, it was discovered that the pool was scheduled to be refurbished prior to the hurricane. (*Id.* at 139:14–16, 144:14–17, 238:5–15).

The jury found for Plaintiff and final judgment was entered in favor of Arch and against Defendant on Count I of the Complaint. (Doc. 290 at 1–2; Doc. 314 at 1).

## II.  DISCUSSION

### A.  Renewed Motion for Judgment as a Matter of Law

Defendant argues that there was no proof that it misrepresented or concealed a material fact, that Defendant failed to take all reasonable steps to protect the property from further damage, or that it failed to permit Plaintiff to examine and make copies of Defendant's books and records. (Doc. 305 at 2–3).

Federal Rule of Civil Procedure 50(b) states:

> If the court does not grant a motion for judgment as a matter of law under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.

Defendant argues that the properly admitted evidence presented by Plaintiff provided no legally sufficient evidentiary basis upon which a reasonable jury could have found for Plaintiff. (Doc. 305 at 4). Defendant insists that without Glicken's prejudicial statements and the improperly admitted EUOs, "Plaintiff's case . . . lacked any evidentiary vitality." (*Id.*).

There was more than sufficient evidence to send the case to the jury. There was evidence that the moisture maps submitted to Arch were duplicates of a second hotel,

that the hurricane could not have caused the amount of damage alleged by Defendant, that Bass was dishonest about his relationship with Juras, that Defendant had plans to renovate the pool before the hurricane, that the damage to the hotel preceded the hurricane, and that Defendant inflated certain costs such as security. This evidence does not include Glicken's testimony or any perceived error related to the EUOs as Defendant had an opportunity to examine Bass as to why he gave evasive answers in connection with Juras. Accordingly, Defendant's Motion for Judgment as a Matter of Law will be denied.

### B.     Motion for New Trial and Motion for Mistrial

Next, Defendant argues it is entitled to a new trial based on Glicken's testimony and the purportedly improperly admitted EUO. The Court has the discretion to grant or deny a party's motion for new trial. *Knight ex rel. Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 807 (11th Cir. 2017). "A Rule 59 motion for a new trial based on evidentiary grounds is to be granted only if the verdict is against the clear weight of the evidence or will result in a miscarriage of justice." *Chmielewski v. City of St. Pete Beach*, 890 F.3d 942, 948 (11th Cir. 2018) (quotation omitted).

Applying Federal Rules of Civil Procedure Rule 61, "a new trial is warranted only where the error has caused substantial prejudice to the affected party (or, stated somewhat differently, affected the party's 'substantial rights' or resulted in 'substantial injustice')." *Knight*, 856 F.3d at 807 (quoting *Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004)). The question to be asked is "how much of an affect did the improperly admitted or excluded evidence have on the verdict?" *Peat*, 378 F. 3d at 1162. In reaching an answer, the Court considers "the closeness of the factual disputes (i.e.,

the strength of the evidence on the issues affected by the error), and the prejudicial effect of the evidence at issue." *Id.* The Court also considers "whether counsel intentionally elicited the evidence, whether counsel focused on the evidence during the trial, and whether any cautionary or limiting instructions were given." *Id.*

        1.     *Samuel Glicken's Testimony*

Defendant insists that despite the overwhelming evidence presented against it, a mistrial is warranted based on Glicken's testimony that he did not believe anything Bass said because "[a]pparently there was past fraudulent activity that can be looked at on Google." (Doc. 283 at 24:6–7). Notably, Defendant did not object to the question.

"[T]he voicing of potentially prejudicial remarks by a witness is common, and any prejudice is generally cured efficiently by cautionary instructions from the bench." *United States v. Pluviose*, 274 F. App'x 766, 767 (11th Cir. 2008). The Court assumes that the jury follows the instructions given. *Id.* (citing *United States v. Kennard*, 472 F.3d 851, 858 (11th Cir. 2006)). The trial court immediately struck the objected to statement and instructed the jury to disregard it. There is no question that the Court was referring to the objected to statement. The Court offered Defendant an opportunity to draft a curative instruction, Defendant declined. The jury was reminded before deliberation that it could not consider any evidence stricken by the Court. What is more, Defendant, not Plaintiff, reminded the jury of Glicken's testimony in closing argument thereby discrediting its argument that Glicken's testimony was sufficiently prejudicial to warrant a new trial.

In addition, Glicken had already testified that he resigned as Defendant's public adjuster because he did not agree with its claim and was concerned that it might be fraudulent. Accordingly, the jury already heard properly admitted testimony that Glicken

10

believed Defendant's claim was fraudulent—the additional statement confirmed the belief he had already formed based on the estimates provided to him by Bass. There was also evidence admitted without objection that Bass had a court case concerning his second hotel. Thus, the jury was well aware that Bass had issues apart from the M Hotel.

Although the Court finds that Plaintiff's counsel should have abandoned the question after the third sustained objection, it declines to find that counsel's persistence amounted to bad faith. *See Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1320 (11th Cir. 2002) ("[B]efore a court can impose sanctions against a lawyer under its inherent power, it must find that the lawyer's conduct constituted or was tantamount to bad faith." (quotation omitted)). Thus, Defendant's motions as to Glicken's testimony will be denied.

### 2. *Examination Under Oath*

Defendant argues that a new trial is warranted because the Court improperly admitted Bass's EUOs into evidence. (Doc. 304 at 10). Defendant argues, for the first time, that an EUO cannot be admitted as substantive evidence in a trial to prove the truth of the matter asserted unless it falls within a limited hearsay exception. (*Id.* at 10–11). Defendant also argues that an EUO is not comparable to a deposition because an EUO is much less reliable. (*Id.* at 12–14).

At the outset, the Court declines to address Defendant's hearsay argument as it was not raised at trial and is, therefore, waived. As for its argument that an EUO is inadmissible as a deposition, the EUOs in this case were admitted as admissions of a party opponent, not as depositions. Thus, any argument concerning depositions is irrelevant.

11

Under Federal Rule of Evidence 801(d)(2), "[a] statement is not hearsay if it is the statement of the party against whom it is offered." *United States v. Williams*, 760 F. App'x 959, 963 (11th Cir. 2019). It is undisputed that Bass made the sworn statements in the EUOs and the statements were offered to demonstrate that he made false claims to Plaintiff concerning the damage to the M Hotel. Accordingly, the EUOs were properly admitted as admissions of a party opponent. *See Sheffield v. State Farm Fire & Cas. Co.*, No. 5:14-cv-38, 2016 WL 3548550, at *3 (S.D. Ga. June 23, 2016) (finding the plaintiff's EUOs were admissions by a party opponent and admissible under Rule 801(d)(2)); *Certain Underwriters at Lloyd's London v. Witham*, 139 F. Supp. 3d 1367, 1372 n.4 (M.D. Ga. 2015) (overruling objection to filing of EUO transcript as discovery because the EUO was likely admissible as an admission by a party opponent pursuant to Rule 801(d)(2)); *Royal Bahamian Ass'n v. QBE Ins. Corp.*, No.10-21511, 2010 WL 4123989, at *2 (S.D. Fla. Oct. 20, 2010) (finding examination under oath testimony was an admission by a party opponent through its designated corporate representative and admissible under Rule 801(d)(2)); *Am. Sec. Ins. Co. v. Kukic*, No. 09-22410-CIV-TORRES, 2010 WL 11505829, at *6 (S.D. Fla. June 25, 2010) (rejecting the defendant's attack to the use of his agent's EUO based on hearsay, speculation, and lack of sufficient predicate and foundation because statements in the EUO were admissions that could be offered against the defendant under Rule 801(d)(2)(A)).

Next, Defendant argues it is entitled to a new trial because it was ambushed by Plaintiff's failure to designate the portions of the EUOs it intended to use during closing argument. (Doc. 304 16–18). Defendant emphasizes that the prejudice is clear in light of the jury question concerning the EUO transcripts asked during deliberations followed

12

by a prompt verdict upon receiving the references to the transcript. (*Id.*; *see also* Doc. 293-1). Plaintiff responds that it is impossible for a party to be ambushed by his own sworn testimony and that it was clear which portions of the EUOs Plaintiff intended to rely on. Plaintiff further highlights that the only portions of the EUO transcripts published during closing argument were related to Bass's destruction of evidence and his omissions concerning Juras. (Doc. 332 at 16). Nonhof testified about the destruction of exhibits and the deception related to Juras during the trial. (Doc. 315 at 135:9–138:21). Plaintiff read portions of the EUO in front of the jury during its direct examination of Bass concerning his responses about Juras. (Doc. 317 at 132:13–136:9).

The Court finds that Defendant has failed to establish it was subjected to a trial by ambush. Defendant was well aware that Plaintiff intended to use the EUOs, was well aware of Bass's statements therein, and Plaintiff made it clear through its questioning which portions of the EUOs it intended to highlight in closing. *See Wammock v. Celotex Corp.*, 793 F.2d 1518, 1527 (11th Cir. 1986) (finding no prejudice nor surprise stemming from the admission of undesignated portions of a deposition where the deposition was listed on the witness list as a potential source of testimony). The jury's question concerned Bass's statements about Juras, which Bass had an opportunity to address at trial. Further, the Court informed Defendant it would allow it to recall any witness it needed to rebut the EUO excerpts and Defendant has failed to direct this Court's attention to any moment it was prevented from doing so. Accordingly, Defendant's motion will be denied as to the EUOs.

    **C.**    **Motion to Compel Appraisal**

13

Finally, Defendant renews its Motion to Compel Appraisal, which has been raised and rejected on numerous occasions. (Doc. 304 at 19–20; *see also* Doc. 16; Doc. 60; Doc. 70; Doc. 82; Doc. 206). They argue that because Michael Cipollo testified at trial that coverage existed for some of the damage to the property and payment was made for some of the damages then the Motion to Compel Appraisal should have been granted. (Doc. 304 at 19–21). Defendant makes the same argument it did on numerous occasions and the Court denies the request for the same reasons. (*See generally* Doc. 82; Doc. 206).

### III. CONCLUSION

For the reasons set forth herein, it is **ORDERED** and **ADJUDGED** that Defendant's Ore Tenus Motion for Mistrial (Doc. 280), Ore Tenus Motion for Sanctions (Doc. 281), Motion for New Trial (Doc. 304), and Renewed Motion for Judgment as a Matter of Law (Doc. 305) are **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on November 5, 2021.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record